# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 9097 | **DATE** | 8/4/2003 |
| **CASE TITLE** | Lynnette Mannie vs. John E. Potter | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 8/18/2003 at 10:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary (Doc. No. 15-1) is denied as to the claim of discrimination based on disparate treatment, and granted as to the claims of retaliation and creation of a hostile work environment.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | | **Document Number** |
| ✓ | Notices mailed by judge's staff. | 2 number of notices | |
| | Notified counsel by telephone. | AUG 0 5 2003 date docketed | |
| | Docketing to mail notices. | | 2C |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 8/4/2003 date mailed notice | |
| ETV | courtroom deputy's initials | CLERK U.S. DISTRICT COURT 03 AUG -4 PM 5: 11 FILED FOR DOCKETING Date/time received in central Clerk's Office | ETV mailing deputy initials |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

AUG 0 5 2003

LYNNETTE MANNIE,            )
                           )
        Plaintiff,         )
                           )
    v.                     )        No. 01 C 9097
                           )
JOHN E. POTTER, Postmaster )        Judge Rebecca R. Pallmeyer
General, United States Postal )
Service,                   )
                           )
        Defendant.         )

## MEMORANDUM OPINION AND ORDER

On November 27, 2001, Plaintiff Lynette Mannie ("Mannie") filed this employment discrimination claim against her employer, the United States Postal Service. She seeks damages for discrimination, retaliation, and creation of a hostile work environment in violation of the Rehabilitation Act, 29 U.S.C. § 701. Mannie alleges that, because she suffers from the mental disability of paranoid schizophrenia, she was not allowed to work as many hours as her co-workers and was deprived of the opportunity to work overtime hours. She claims that this disparate treatment constituted both discrimination for a mental disability and retaliation for her earlier complaints to the Equal Employment Opportunity Commission (EEOC) of discrimination based on both mental and physical disabilities. In addition, Mannie alleges that the actions and statements of her supervisors and co-workers created a hostile work environment that changed the conditions of her employment and made it difficult for her to function effectively in her job.

Defendant has moved for summary judgment, arguing that: (1) Mannie was not disabled within the meaning of the Rehabilitation Act because neither her physical nor her mental impairment prohibited her from carrying out a major life function; (2) Mannie suffered no materially adverse employment action because, as a part-time regular employee, she was not entitled to work the additional hours she claims, and (3) the allegations made by Mannie against her supervisor and



co-workers did not constitute an objectively hostile environment under the standard established by the Seventh Circuit.

For the reasons cited below, Defendant's Rule 56(c) motion is granted as to Mannie's retaliation and hostile work environment claims, but denied as to Mannie's discrimination claim.

## FACTUAL BACKGROUND[1]

### A.    Mannie's Claimed Disabilities

In August 1994, Mannie was hired as a part-time regular employee by the U.S. Postal Service in Chicago.   (Defendant's Local Rule 56.1 Statement of Uncontested Facts ¶ 1) (hereinafter, "Def.'s 56.1").)  She suffers from both physical and mental impairments.  In 1993, before her term of employment at the Post Office began, Mannie was diagnosed as a paranoid schizophrenic. (Def.'s 56.1 ¶ 10.)  In 1996, Mannie injured her right wrist while carrying out her duties as a mail sorter.  (Amended Plaintiff's Rule 56.1 Statement in Opposition to Defendant's Motion for Summary Judgment ¶ 4, 76) (hereinafter, "Pl.'s 56.1").)  In 1998, she was diagnosed with tendonitis in the same wrist.  (Def.'s 56.1 ¶ 3.)

Both parties agree that, despite her physical and mental impairments, Plaintiff is able to lead a full life without the assistance of others.  (Def.'s 56.1 ¶¶ 22-23.) She lives alone, is able to tend to her personal needs and manage her own affairs, and takes medication that helps control her mental disorder.  (Def.'s 56.1 ¶¶ 24-26.)  In addition, Mannie attends night classes at a local college in Chicago and is on schedule to graduate with a degree in education.  (Def.'s 56.1 ¶ 27.) In pursuit of her degree, she has been able to take notes in her classes, take exams, and write papers; she has also communicated effectively with both students and teachers in real-life classrooms as part of her student-teaching curriculum.  (Def.'s 56.1 ¶¶ 28-29.) These life successes aside, there is

---

[1]      The court compiled the facts for this section from the parties' Local Rule 56.1(a)(3) and (b)(3) Statements of Material Facts and attached exhibits. As described below, these statements reflect a number of factual disputes between the parties.

little doubt that Mannie's mental and physical impairments have contributed to a troubled employment history with the Postal Service.

### 1.    Mannie's Mental Impairment

Mannie's claimed mental disability, paranoid schizophrenia, has been the subject of administrative action between her and the Postal Service since before she was hired. As part of her initial application for employment with the Postal Service on January 26, 1994, Mannie completed Form 2485, "Medical Examination and Assessment."[2]    (Arbitration Decision of 7/24/1996, Ex. 7 to Pl.'s 56.1, at 2) (hereinafter, "Arb. Dec.").) In response to a question on the form asking whether she had ever received treatment for a psychiatric disorder, Mannie responded that she was treated for paranoia from December 1992 to February 1993. (*Id.*) She also provided a statement from her physician, who indicated that he had treated her for "paranoid delusions" from December 1992 until August 1993, but that as of January 1994, he observed "no evidence of continued paranoid or other psychotic symptoms."[3] (*Id.* at 6.) Mannie was denied employment by the Postal Service, and filed an EEO complaint in February 1994 claiming that the negative decision was based on her psychological condition. (*Id.*; Mannie Aff., Ex. 1 to Pl.'s 56.1, at 1.)

In August 1994, based on her initial application score, Mannie was called to apply again for employment with the Postal Service.[4] (Arb. Dec., at 2.) She again completed and submitted Form 2485, but this time stated that she had never suffered from or been treated for a psychiatric

---

[2]    The parties did not include a copy of any of the Forms 2485 completed by Mannie, either prior to or during her tenure at the Post Office. Those forms were, however, discussed in detail at an arbitration hearing that took place on July 24, 1996, at which Mannie successfully challenged her termination from the Postal Service.

[3]    Plaintiff has not submitted such a statement into the record directly, but relies on the text of the arbitrator's decision for information concerning her mental condition at the time of her initial application.

[4]    Neither Mannie's initial application score, nor the letters denying her employment and inviting her to re-apply with the Postal Service, are part of the record.

disorder. (Id.) Mannie had been hired as a part-time regular mail processor and began working the next day. (Id. at 3.) Because she had been hired by the Postal Service, in December 1994 Mannie dropped her February 1994 EEO complaint. (Mannie Dep., Ex. 1 to Def.'s 56.1, at 41:3-4.)

On September 6, 1995, Mannie was required to complete an emergency fitness for duty exam after her supervisor, Phyllis James ("James"), (Arb. Dec., at 3), reported that co-workers had complained about Mannie's "erratic behavior, constant staring, and paranoia." (Id.) As part of this exam, Mannie was required to fill out yet another Form 2485, in which she again stated that she had not received treatment for a psychological disorder. (Id.) Mannie would later claim that, based on the submission of the medical statement and truthful answer in January 1994, she "assumed that she didn't have to put in any more information" with regards to her treatment for paranoia. (Id. at 6.) At any rate, the discrepancy between Mannie's original response in January 1994 and her subsequent responses in August 1994 and September 1995 were finally discovered by the Postal Service, and Mannie was terminated on September 26, 1995. (Id. at 3.) The notice of termination was tendered by James, and signed by another supervisor on her behalf. (Id.)

In response to her termination, Mannie immediately filed a grievance, which eventually was appealed to arbitration. (Id. at 4.) The Postal Service claimed that Mannie was discharged because she had twice intentionally falsified Form 2485, first to secure and later to maintain employment. (Id. at 4-5.) On behalf of Mannie, the American Postal Workers Union argued that: (1) she had been discharged because of her mental disability, (2) she had not intentionally withheld the information, and (3) she had been denied due process because her supervisor did not investigate the alleged falsification of documents before issuing Mannie's Notice of Removal. (Id. at 5-6.) Citing both the due process violation and a lack of evidence that Mannie had intentionally falsified the forms, the arbitrator sided with the Union and reinstated Mannie to her previous

position without loss of seniority or benefits.[5] (*Id.* at 7-8.) Phyllis James, the supervisor who submitted the complaints about Mannie and issued the Notice of Removal overturned by the arbitrator's decision, remained Mannie's direct supervisor after her reinstatement.

Mannie had been back on the job for approximately two months when she injured her wrist while sorting the mail. (Def.'s 56.1 ¶ 2.) Following her injury, Mannie was assigned to the "Nixie Unit" from September 1996 to April 1997, returned to her former position until October 1998, then was reassigned to the Nixie Unit where she has remained ever since. (Pl.'s Dep., at 56.) The Nixie Unit is responsible for repairing and processing damaged mail. (Def.'s 56.1 ¶ 5). As the work requires no heavy lifting, the Postal Service staffs the Nixie Unit primarily with those employees who have been placed on "light" or "limited" duty as a result of disabilities or other physical limitations. (Def.'s 56.1 ¶¶ 6-7). By the accounts of both parties, Mannie's assignment to the Nixie Unit was an accommodation based on her physical impairment (the injury to her wrist), and was unrelated to her mental impairment (the history of paranoid schizophrenia). (Def.'s 56.1, ¶¶ 3-5.)

## 2. Mannie's Physical Impairment

Although the complaint before this court focuses on alleged discrimination against Mannie for her psychological disorder, her physical limitations are relevant because she is alleging retaliatory action based on her earlier EEO claims, including one related to her physical problems. On September 29, 1996, Mannie injured her right wrist lifting heavy trays of bulk business mail and loading them into the mail feeder to be separated by zip code. (Def.'s 56.1 ¶ 2; Mannie Dep.,

---

[5]     Plaintiff claims in both her Amended Rule 56.1 Statement ¶ 75 and in an affidavit filed with her underlying EEO complaint, (Mannie Aff., at 1), that she was initially denied employment based on her mental health condition. The arbitration decision reinstating Mannie does not address the reason Mannie was denied employment by the Postal Service in January 1994. (Defendant's Reply to Plaintiff's Amended Rule 56.1 Statement ¶ 75) (hereinafter "Def.'s Reply").) Rather, the arbitrator noted only that Mannie was fired by the Postal Service based on its claim that she had falsified documents, and that she was reinstated based on a violation of due process and a lack of evidence as to the falsification charges. At no point did the arbitrator, or any entity other than Plaintiff herself, find that Mannie was denied employment or otherwise discriminated against based on her mental disability.

54:22-24; Letter from U.S. Department of Labor Hearing Representative to Mannie of 3/6/1998, Ex. 6 to Pl.'s 56.1, at 2) (hereinafter "DOL Letter").) The following day, Mannie advised her supervisor, Phyllis James, of the injury, and was directed to the Health Unit of the postal facility, where she was "examined, placed on limited light duty, provided with a right wrist band, and [given] Motrin for pain."[6] (DOL Letter, at 2.) In October 1996, Mannie sought additional medical care from Humana Health Care, and submitted a claim for workers' compensation to the U.S. Department of Labor, Office of Workers' Compensation Programs, indicating that she had injured her wrist on September 29 by repetitive lifting of overloaded trays of mail. (Id. at 1.)

While her workers' compensation claim was pending, Mannie remained on "light duty," working in the Nixie Unit.[7] (Mannie's Dep., at 56:14-57:17.) Mannie remained in the Nixie Unit until April 9, 1997, when her claim was denied by the Office of Workers' Compensation Programs for failure to provide adequate supporting medical evidence of the injury.[8] On March 3, 1998, the Hearing Officer vacated the original denial of the claim from April 1997 and held that the injury was covered under the Federal Employees' Compensation Act as a work-related injury. (Id. at 4.)

---

[6]     Mannie relies primarily on a third-party document (a letter from the U.S. Department of Labor) to describe the facts of her workers' compensation claim.

[7]     Mannie distinguishes between the terms "light" and "limited" duty. She testified that Postal Service employees placed on "light" duty have injuries that are not work related, while employees on "limited" duty have work-related injuries. (Pl.'s Dep., at 56:14-24.) During her time in the Nixie Unit from September 1996 to April 1997, Mannie was considered on light duty because her case had not yet been considered by the Department of Labor. (Id.) After the tendonitis in her wrist was diagnosed in 1998, Mannie was placed on limited duty, where she remains.

[8]     Plaintiff's response to Defendant's Rule 56.1 Statement ¶ 4 inaccurately states that "Plaintiff's claims to physical disability were previously denied by Defendant and were only accommodated after she appealed to the Department of Labor in 1997." (Pl.'s 56.1 ¶ 4.) As Plaintiff acknowledges in her deposition, it is the U.S. Department of Labor, not the Postal Service, that is responsible for making decisions regarding workers' compensation claims. (Pl.'s Dep., at 55). Further, Mannie admits that the Postal Service accommodated her injury by placing her in the Nixie Unit until her claim was initially denied. (Id.) Although Defendant's Reply to Plaintiff's Amended Rule 56.1 Statement ignores it, this inconsistency requires the Court to deem ¶ 4 of Defendant's Rule 56.1 Statement as admitted.

In March 1998, Mannie was also diagnosed by her doctor with tendonitis in her right wrist. (Def.'s 56.1 ¶ 3.) At that time, her doctor recommended that she be restricted from lifting items weighing more than five pounds. (Id.) In October 1998, Mannie was reassigned to the Nixie Unit based on these restrictions; she has remained employed there since that date.[9] Mannie admits that her reassignment to the Nixie Unit constitutes an accommodation of her physical limitations by the Postal Service, that she enjoys her job there, and that she is able to fulfill all of her required duties in the Nixie Unit without any special assistance. (Def.'s 56.1 ¶¶ 8-9.)

## B. Mannie's Current Complaint

After Mannie's reassignment to the Nixie Unit in October 1998, she did not take any official action against her employer until June 29, 2000, when she sought EEO counseling for alleged discrimination based on her psychological condition.[10] (Def.'s 56.1 ¶ 16). At that time, Mannie felt that she had been unfairly treated relative to other employees in the Nixie Unit with regard to the number of hours she worked and eligibility for overtime work. (EEO Information for Precomplaint Counseling Form of 6/29/2000, Ex. 2 to Def.'s 56.1, at 1) (hereinafter, "Precomplaint Form").) In addition, Mannie claimed she was unfairly singled out among the employees of the Nixie Unit because she had received a letter requiring her to participate in a fitness-for-duty examination.[11]

---

[9]     Defendant's Rule 56.1 Statement ¶ 4, not properly refuted by the Plaintiff, states that Mannie's assignment to the Nixie Unit in October 1998 was an accommodation based on the diagnosis of tendonitis in her wrist.

[10]     In its Motion for Summary Judgment, Defendant often interchanges references to Mannie's physical disability (wrist tendonitis) and her mental disability (paranoid schizophrenia), but Mannie's formal EEO Complaint cites only discrimination based on her psychological condition. Both parties agree in their respective Rule 56.1 Statements that Mannie's physical disability: (1) was recognized by the Postal Service, (2) was accommodated through Mannie's reassignment to the Nixie Unit, and (3) does not affect Mannie's ability to carry out her duties within the Nixie Unit. As noted earlier, Mannie's physical disability is relevant here only with regard to a claim of retaliation.

[11]     Plaintiff's Amended Rule 56.1 Statement ¶ 16 denies Defendant's statement that these were the extent of the grievances claimed in the Precomplaint Form. The form itself contains (continued...)

(*Id.*)

On August 22, 2000, Mannie filed an official EEO discrimination complaint, which later became the basis for this litigation. (Def.'s 56.1 ¶ 17; Formal EEO Complaint of Discrimination, Ex. 3 to Def.'s 56.1) (hereinafter, "Formal EEO Complaint").) Mannie's complaint of discrimination based on her mental disability did not mention the fitness-for-duty exam, though she did raise that matter in her supporting affidavit. (Formal EEO Complaint, at 1; Mannie Aff., at 1-2.) She also claimed that her supervisors had made "negative comments" about her mental condition that led to the denial of full hours and benefits. (*Id.*) The fitness-for-duty exam and claim of lost hours and benefits from the EEO action formed the basis of the discrimination and retaliation claims of Plaintiff's complaint; the behavior of her supervisors and other co-workers provides the basis for the hostile work environment claim.

### 1.     Fitness-for-Duty Exam

On June 13, 2000, Mannie received a letter from a Human Resources Manager, John L. Richardson ("Richardson") instructing her to report to a physician for a fitness-for-duty examination. (Letter from Richardson to Mannie of 6/13/2000, Ex. 4 to Def.'s 56.1, at 1.) In the affidavit accompanying her EEOC charge, Mannie alleges that Richardson sent this letter in retaliation for Mannie's earlier EEO actions against the Postal Service.[12] (Mannie Aff., at 1.) She also alleges

---

[11](...continued)
no allegations of harassment or derogatory references by co-workers based on Plaintiff's mental condition, as Plaintiff claims in her Rule 56.1 Statement, however. As Plaintiff's response has no factual support in the record, ¶ 16 of Defendant's Rule 56.1 Statement is deemed admitted.

[12]     In her affidavit, Mannie cites a letter sent by Richardson on April 20, 1994 rejecting her appeal of the Postal Service's initial decision to deny her employment with the Postal Service. She also claims that Richardson was the subject of the EEO action she brought against the Postal Service for denying her employment in 1994, and that the June 2000 letter requiring that she report for a fitness-for duty examination was a retaliatory act for that initial action. The only evidence Mannie presents in her Amended Rule 56.1 Statement regarding Richardson in support of these assertions is her own affidavit. As stated above, she does not provide a copy of either the alleged April 1994 letter or her 1994 EEOC charge.

that her mental disability, rather than her wrist tendonitis, was the impetus behind the directive to report for a fitness-for-duty examination. (*Id.*) In her deposition, however, Mannie admits she was not the only disabled employee asked to comply with a fitness for duty examination, that such exams are part of normal procedure, and, furthermore, that she knew it was the diagnosis of her tendonitis that led to the Postal Service requiring a fitness-for-duty examination. (Def.'s 56.1 ¶¶ 32-34.) As Defendant notes, Plaintiff does not include the fitness-for-duty exam among her complaints in her response to Defendant's motion; thus, the Court will focus on the other actions Plaintiff alleges to have been materially adverse.

### 2. Loss of Hours/Overtime

Mannie claims that, because of her mental disability, she was discriminated against relative to other part-time regular employees in the Nixie Unit who suffered only from physical disabilities. Specifically, she claims that she was not permitted to work the same number of hours per week and was not assigned overtime work.

In her affidavit, Mannie claims repeatedly that she was not permitted to work her scheduled hours. (Mannie Aff., at 1-2.) Further, she contends that, as a part-time regular employee, she is "required to work a 7½ or 8 hour day to make sure that I meet the requirement of a 36-hour guaranteed workweek." (*Id.* at 3.) Similarly, in her deposition, Mannie initially testified that she was "entitled" to work eight hours a day, five days a week, "because part-time regular duties is [*sic*] forty hours a week." (Mannie Dep., at 103:14-104:9.) As Defendant has shown, however, the collective bargaining agreement between the Postal Service and the American Postal Workers Union provides that only full-time employees are entitled to such hours, and that part-time employees shall be assigned shorter work schedules. (Def.'s 56.1 ¶ 38;1998-2000 Union Agreement, Art. 7 §1, Art. 8 §1, Ex. 6 to Def.'s 56.1.) Mannie admitted under further questioning in her deposition that, as a part-time regular employee, she was guaranteed only six hours of work a day. (Mannie

Dep., at 105:7-22.) She also testified that on occasions when her supervisors, Phyllis James and Camille Buford, had attempted to send her home before she had completed six hours of work, she had always stayed at work and been paid for a full six hours. (*Id.* at 113:1-10.)

Mannie admits that, as a part-time regular employee, she was not guaranteed the same hours as full-time employees of the Postal Service. She claims, however, that several other part-time regular employees in the Nixie Unit, who suffered from physical but not mental disabilities, regularly were allowed to work forty hours per week, while she was not.[13] (Pl.'s 56.1 ¶¶ 47, 49.) Further, two co-workers of Mannie, Ila Pettus and Marriem Graham, submitted affidavits stating that they regularly saw Mannie being sent home, while other employees on light or limited duty were permitted to continue working. (Pl.'s 56.1 ¶¶ 65-67.) These same co-workers claimed that Mannie's supervisors often sent her home "early," which they did not do with other employees. (Pl.'s 56.1 ¶¶ 69, 73.) Specifically, Pettus testified that "she regularly saw and heard" Plaintiff instructed to go home, while others worked. (Pettus Aff., at 1.) Similarly, Graham testified that she also saw Mannie leaving early, while other employees in the Nixie Unit would continue to work. (Graham Aff., at 2.) Both co-workers worked the same shift as Mannie; one worked in the manual letters and flats department, while the other worked in the DBCS unit and on the same floor of the building as Mannie.[14] (Pettus Aff., at 1; Graham Aff., at 1.)

---

[13]     In Defendant's Reply to Plaintiff's 56.1 Statement, Defendant notes, accurately, that the only evidence Plaintiff presents to support her allegations that eight part-time regular employees on light or limited duty were allowed to work a "full schedule" or "forty hours a week" are her own affidavit and answers to interrogatories, as well as the Precomplaint Form.

[14]     Defendant contests ¶ 69 and ¶ 73 of Plaintiff's Amended Rule 56.1 Statement, claiming that the affidavits of co-workers Pettus and Graham fail to meet the standard of F.R.C.P. Rule 56(e) that the affiant affirmatively set forth facts demonstrating that they have personal knowledge of the matters stated. The court overrules this objection. Pettus and Graham stated in their affidavits that they saw Plaintiff sent home early while other workers in the Nixie Unit remained. (Pettus Aff., Ex. 3 to Pl.'s 56.1, at 2; Graham Aff., Ex. 4 to Pl.'s 56.1, at 2.) Pettus and Graham could testify to these personal observations. Further, Defendant, who presumably has access to hourly work records, has offered no evidence to rebut Plaintiff's assertion. Thus, ¶ 69 and (continued...)

Mannie's other major complaint relates to overtime hours. In the Nixie Unit, there is an "overtime-desired list" for part-time regular employees, and those employees who want to work overtime are instructed to sign their names to the list. (Mannie Dep., at 113:11-22.) Those responsible for managing overtime in the Postal Service then use the list to select employees for overtime service. (Id.) Mannie claims that her supervisors told her that limited and light-duty employees were not entitled to overtime, and that they did not give her the opportunity to sign the list. (Mannie Aff., at 2-3.) She contends that this was due to her mental disability, as others in the Nixie Unit who only had physical disabilities were allowed to work overtime. (Id.) In her deposition, however, Plaintiff admits that she never asked to sign the overtime-desired list because she wanted to avoid having an argument with her supervisor.[15] (Mannie Dep., at 114:5-25.)

Mannie claims that the disparate treatment by her supervisors constituted both: (1) discrimination based on her disability ("I have psychological disorder and because I have it, I am not being allowed to work my scheduled hours or overtime") and (2) retaliation for earlier EEO actions against James, Buford, Richardson, and other Postal Service employees ("I feel that my prior EEO activity was the reason that I . . . was not permitted to work my scheduled hours"). (Mannie Aff., at 1-2.) She also alleges that the treatment, which she claims began in August 1996, resulted in a loss of more than $100,000 in wages relative to other part-time regular employees during that time period.[16] (Pl.'s 56.1 ¶ 50.)

---

[14](...continued)
¶ 73 of Plaintiff's Amended Rule 56.1 Statement are deemed admitted.

[15] In her deposition, Mannie provides no explanation for her belief that asking her supervisors for permission to sign the overtime-desired list would result in an argument. Because she admits that she never actually asked to sign the list, the court concludes that she was not actually prohibited from doing so.

[16] Plaintiff calculates a figure of $108,500 by claiming that she lost between 7.5 and 20 hours per week compared to other part-time regulars. At her average wage of $15/hour, Mannie estimates that she lost $150/week in regular pay and $225/week in overtime pay, for an average
(continued...)

### 3. Behavior of Mannie's Supervisors and Co-Workers

Mannie contends that a pattern of abusive behavior emerged among her supervisors and other co-workers, creating a hostile work environment. First, she claims that her supervisors, James and Buford, inappropriately revealed information regarding her mental impairment to her co-workers. (Def.'s 56.1 ¶ 20.) According to Mannie, the two supervisors "are continually communicating negative comments" about her psychological disorder. (Mannie Aff., at 3.) One co-worker of Mannie's, Edmund Lindsay, testified that he personally heard a supervisor make demeaning statements towards Mannie. Specifically, Lindsay stated that he heard supervisor Phyllis James refer to Mannie as "'crazy' almost daily." (Pl.'s 56.1 ¶ 56.) When co-workers would question James about this assertion, she would assure them that Mannie was "certifiable," and that she possessed paperwork to that effect.[17] (Id.) Further, over a six-month period, Lindsay heard James say that Mannie could not be relied upon to operate a particular type of machinery because the Post Office needed "live bodies" to do so. (Pl.'s 56.1 ¶ 61.) Lindsay also heard James tell a male co-worker of Mannie's that he was "wasting his time" in trying to talk to her because Mannie "didn't like men but preferred women." (Pl.'s 56.1 ¶ 60.) Mannie claims that this mistreatment and alleged inappropriate behavior by her supervisors created a great deal of stress, humiliation, and embarrassment for her.

Mannie also cites behavior by other co-workers at the Postal Service that created a hostile work environment. First, two co-workers of Mannie testified that they heard co-workers discuss

---

[16](...continued)
loss of $375/week since the discriminatory treatment allegedly began in August 1996. (Plaintiff's Answers to Interrogatories ¶ 7, Ex. 5 to Pl.'s 56.1.)

[17]     Defendant admits the truth of Lindsay's testimony for purposes of summary judgment. In Defendant's Rule 56.1 Statement ¶ 21, Defendant cites Mannie's deposition as evidence that Mannie revealed information about her disability to certain co-workers in whom she felt comfortable confiding. The court notes that Mannie's own revelations would in no way justify the behavior of Ms. James to which Mr. Lindsay has testified.

rumors that Mannie suffered from mental problems. (Pettus Aff., at 2; Graham Aff., at 2.) Further, Mannie felt that female co-workers would wear tight-fitting clothing and then bend over or "strut" in front of her, so as to offend her. (Def.'s 56.1 ¶ 13.) Mannie also alleged that a woman had hugged her at work, not to express affection but only to check her body odor. (Def's 56.1 ¶ 14.) Two miscellaneous first-class letters were once placed in her locker; though the letters were not addressed to her, Mannie claims they were placed there to harass her. (Def's 56.1 ¶ 13.) Finally, Mannie insisted that a male co-worker taking night classes at the same local university she attended was following her. (Def's 56.1 ¶ 15.) Mannie contends that all of these alleged actions by her co-workers contributed to a difficult work environment for her, though she does not claim to have brought any alleged harassment to the attention of her supervisors.

## DISCUSSION

Plaintiff claims that she was the victim of: (1) discrimination based on her mental disability, (2) retaliation for her earlier EEOC activity based on both her physical and mental disabilities, and (3) a hostile work environment. Defendant moves for summary judgment on all of Plaintiff's claims.

A motion for summary judgment will be granted only if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The court must consider the evidence and draw all reasonable inferences in favor of the nonmoving party. *Bennington v. Caterpillar, Inc.*, 275 F.3d 654, 658 (7th Cir. 2001), *cert. denied*, ___ U.S. ___, 123 S.Ct. 96 (2002). The court's function in ruling on a motion for summary judgment is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Where factual matters are in dispute, the court is required to credit the non-movant's version of events. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 802 (7th Cir. 2000). Employment discrimination cases are fact-intensive, but the court is not required to "scour the record" in an effort to assist the plaintiff in avoiding summary judgment. *Greer v. Bd.*

*of Ed. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001). Additionally, affidavits presented by the nonmoving party in support of its case must be made on personal knowledge and must set forth such facts as would be admissible in evidence. FED. R. CIV. P. 56(e).

In her complaint, Plaintiff asserts that her action against the Postal Service arises under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and Title VII of the Civil Rights Act of 1964. As Defendant notes in its motion, Title VII does not apply to this case because plaintiff alleges discrimination based on her mental disability, not on the basis of race, color, religion, sex, or national origin. (Defendant's Motion for Summary Judgment, at 1) (hereinafter, "Def.'s Motion").) Additionally, the ADA does not permit discrimination actions against the federal government, so Mannie may not bring her case under that act. 42 U.S.C. § 12111(5)(B). Thus, Mannie's claims for discrimination and retaliation must arise under the Rehabilitation Act. 29 U.S.C. § 794. It is well-established, however, that the standards applicable to claims brought under the ADA also apply to Rehabilitation Act claims. *Gile v. United Airlines, Inc.*, 95 F.3d 492, 496 (7th Cir. 1996). Mannie's claim of creation of a hostile work environment under the ADA has not been officially recognized in the Seventh Circuit, but courts have proceeded on claims of such harassment assuming that such a cause of action exists. *Silk v. City of Chicago*, 194 F.3d 788, 803 (7th Cir. 1999). No court in this Circuit has recognized a cause of action for hostile work environment against the federal government based on the Rehabilitation Act; however, as with the discrimination and retaliation issues, this court will proceed under the assumption that if such a claim exists under the ADA, it also is actionable under the Rehabilitation Act.

## A.    Discrimination Claim

Discrimination under the Rehabilitation Act can take two forms: (1) disparate treatment–a claim that an individual with a disability was, due to that disability, treated differently than a non-disabled co-worker, or (2) failure to accommodate–a claim that the employer did not make

reasonable accommodations for an individual who is disabled but otherwise qualified. *See, e.g.*

*Hoffman v. Caterpillar, Inc.* 256 F.3d 568, 572 (7th Cir. 2001). In this case, Plaintiff has raised a

disparate treatment claim. Specifically, Plaintiff alleges that she was treated differently than her

co-workers in the Nixie Unit by consistently being sent home early from work and by being denied

access to the overtime-desired list.

Regardless of the type of discrimination alleged, a plaintiff seeking to prove discrimination

against a federal employer under the Rehabilitation Act must establish a *prima facie* case for

discrimination. Just as with cases brought under the ADA, Plaintiff must show that: (1) she is

disabled or regarded as disabled under the definition of the Act; (2) she is otherwise qualified, with

or without accommodations, to perform the essential functions of her position; and (3) she suffered

an adverse employment decision because of her disability. *Dvorak v. Mostardi Platt Assocs., Inc.*,

289 F.3d 479, 483 (7th Cir. 2002). In its motion for summary judgment, Defendant argues that

Plaintiff fails to meet both the first and third prongs of the *prima facie* case. (Def.'s Motion, at 1.)

### 1. Mannie's Disability

The regulations applicable to the Rehabilitation Act, later used in the ADA, define "disability"

as a "physical or mental impairment that substantially limits one or more of the major life activities

. . . such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking,

breathing, learning, and working." 29 C.F.R. §§ 1630.2(g),(i). Defendant argues that Mannie does

not suffer from a "disability," as defined under the Rehabilitation Act, because neither her wrist

tendonitis nor her paranoid schizophrenia substantially limits her from carrying out any major life

activity.[18] The court agrees. Mannie is able to maintain her household, support herself, and hopes

soon to earn her degree in education and begin her career as a teacher. She is also able to

---

[18] In its motion, Defendant argues that neither Mannie's tendonitis nor her
schizophrenia impairs major life activities. Because, as noted earlier, Mannie is claiming
discrimination based only on her mental disability, the court will address Defendant's arguments
with regard to Mannie's mental impairment only.

complete all of her required duties at the Postal Service. In fact, Mannie has provided no evidence that any of her major life functions is impeded by her schizophrenia. To the contrary, she acknowledged that she takes medicine daily, as prescribed by her doctor, which controls the symptoms of her illness.

Under the Rehabilitation Act, to demonstrate a disability, plaintiff must show her impairment "prevent[s] or severely restrict[s]" her from "doing activities that are of central importance to most people's daily lives." *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002). Mannie notes that courts have previously defined schizophrenia as a "disability" under the ADA. The question as to whether her own impairment constitutes a disability, however, is "an individualized inquiry." *Sutton v. United Air Lines, Inc.*, 527 U.S 471, 483 (1999); *see also Krocka v. City of Chicago*, 203 F.3d 507, 513-14 (7th Cir. 2000) (applying *Sutton* to discrimination claim of Chicago police officer suffering from severe depression). In this case, Mannie's schizophrenia cannot be considered a disability because it does not meet the standard established by the Supreme Court in *Toyota*. Mannie suggest that *Toyota* should be limited to cases involving carpal tunnel syndrome, or even to cases regarding physical disabilities; but the Supreme Court's language in its opinion was broad enough to reach to all types of disabilities. Thus, Mannie has not shown that she is actually disabled, as defined by the Rehabilitation Act.

The court notes, however, that an individual may be considered "disabled" under the ADA, if she is regarded or perceived by her employer as having such an impairment. 42 U.S.C. § 12102(2). The "regarded as" prong is "intended to provide a remedy for discrimination based on misperceptions about the abilities of impaired persons." *Krocka*, 203 F.3d at 513-14. There are two ways an individual may fall within the category of "perceived as having a disability": (1) the employer mistakenly believes the individual has an impairment that substantially limits one or more major life activities, or (2) the employer mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities. *Sutton*, 527 U.S. at 489 (1999). Thus, the

16

employer must harbor misperceptions about the employee that often result from "stereotypic assumptions not truly indicative of . . . individual ability." *Id.*; 42 U.S.C. § 12101(7). Inserting the definition of "major life activities" adopted by the Supreme Court in *Toyota*, Mannie will show that the Postal Service perceived her to be disabled if she can prove that it regarded her as unable to perform tasks "of central importance to most people's daily lives."

From the evidence, a reasonable jury could find that the Postal Service perceived Mannie as unable to carry out the major life task of working. First, Mannie provides affidavits from co-workers that her supervisors constantly referred to her as "crazy," and that her supervisor, Ms. James, told her co-workers that she "had paperwork" on Mannie showing she was "certifiable." Ms. James had also previously written a formal complaint to the Postal Inspection Service citing Mannie's "erratic behavior, constant staring, and paranoia." Further, a co-worker of Mannie's testified that James stated that Mannie could not be relied upon to operate a particular piece of machinery because such work required "live bodies." The implication that Mannie could not be trusted to carry out tasks at work, and that she was not even a "live body," can be interpreted as an expression of "myth, fear, or stereotype" in the Postal Service's assessment of Mannie's condition. *Cf. Wright v. Illinois Dep't of Corr.*, 204 F.3d 727, 732 (7th Cir. 2000), citing 29 C.F.R. App. to Pt. 1630, at 350.

The fact that Mannie was assigned to the Nixie Unit arguably demonstrates that the Postal Service believed that her physical disability would not impede her ability to function effectively there. Nevertheless, the evidence that Mannie was treated differently from her co-workers, combined with regular statements by her supervisors that she was "crazy" and could not do the work, tell a different story about the treatment of Mannie's mental disability. The Postal Service claims that the evidence does not show that it perceived Mannie's mental disability to substantially limit her ability to carry out the major life function of working. Indeed, where the major life activity alleged to be affected is working, the phrase "substantially limits" requires that plaintiff be unable

to work in a broad range of jobs, not merely unable to perform a single, particular job. *Sutton*, 527 U.S. at 491. Thus, in *Stewart v. County of Brown*, 86 F.3d 107 (1996), plaintiff claimed that the defendant county sheriff believed plaintiff was "excitable," had ordered psychological evaluations, and had told third persons he believed plaintiff was emotionally or psychologically imbalance. The *Seventh Circuit* believed these factors, combined with the sheriff's conclusion that plaintiff was unsuited for work as a sheriff's deputy, did not constitute evidence that the sheriff perceived plaintiff as mentally impaired where plaintiff himself had characterized the dispute as "nothing more than personalities." 86 F.3d at 111. In the case before this court, the evidence goes well beyond a mere personality conflict and provides a basis for a reasonable jury to conclude that Mannie's supervisors considered her unable to perform a number of functions. As a genuine issue of material fact exists regarding the Postal Service's perception of Mannie's mental disability, summary judgment on this basis is inappropriate.

### 2.    Materially Adverse Employment Action

The Defendant claims that Mannie also does not meet the third prong of the *prima facie* case for discrimination because she did not suffer a materially adverse employment action. An employee need not be fired or suffer a reduction in benefits or pay, or even any readily quantifiable losses, to be considered the victim of a materially adverse action. *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996). On the other hand, minor or trivial actions that simply make an employee unhappy do not rise to the level of materially adverse. *Id*. "The question whether a change in an employee's job or working conditions is materially adverse, rather than essentially neutral, is one of fact . . . and so can be resolved on summary judgment only if the question is not fairly contestable." *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 273-74 (7th Cir. 1996).

Mannie's original EEO complaint cited two materially adverse employment actions: (1) the June 2000 request that she complete a fitness-for-duty exam, and (2) the fact that she was allowed

to work only thirty hours per week and was not eligible to work overtime, which she claimed set her apart from the other employees in the Nixie Unit. As Mannie did not reiterate her claim regarding the fitness-for-duty exam in her response to Defendant's motion for summary judgment, the court will focus only on her claim of lost regular and overtime hours.

Defendant argues, first, that, as a part-time regular employee, Mannie is entitled only to work thirty hours per week, and that therefore the Postal Service has not discriminated against her by allowing her to work these hours and no more. (Def.'s Motion, at 8-9.) The Defendant has presented evidence, undisputed by the Plaintiff, that part-time regular employees like Mannie are not required by the union-management agreement to work forty hours a week or work overtime. Mannie's claim is not limited to the statement that she was "entitled" to a full workday, however. (Pl.'s Reply at 13.) She also alleges that similarly situated workers (other part-time regular employees in the Nixie Unit) were allowed to work more hours than her and allowed to work overtime, whereas she was not because of her mental disability. *Id.*

In attempting to demonstrate a material adverse employment action, Mannie provides affidavits from both herself and two co-workers stating that she was allowed to work no more than six hours per day, while other part-time regular employees in the Nixie Unit worked longer hours, as well as overtime. She cites the names of several employees, both in the Nixie Unit and other departments, whom she claims were allowed to remain on duty while she was sent home by her supervisors. In addition, the two co-workers, both of whom worked the same shift as Mannie and at least one of whom worked on the same floor, claim that Mannie was treated differently than other similarly-situated employees in the Nixie Unit, in that they, and not Mannie, were allowed to work longer regular hours and work overtime.

Defendant contends that these affidavits do not meet the standard required under FED. R. CIV. P. 56(e) because they are not based on personal knowledge of the affiants. (Defendant's Reply Memorandum in Support of Summary Judgment, at 8) (hereinafter, "Def.'s Reply").) In this

court's view, however, Mannie would have first-hand knowledge that she was always the first employee sent home. Nor are the affidavits of co-workers Pettus and Graham based on speculation or conjecture. These two women worked every day with Mannie, were familiar with the employees in the Nixie Unit, and testified to disparate treatment that they witnessed first-hand. Affiant Pettus testified that she witnessed Mannie's supervisors, either in person or by public address system, consistently tell Mannie to leave work after six hours while others in the Nixie Unit would work a full eight hours. Affiant Graham claimed that Mannie would leave work early and that others in the Nixie Unit would remain after Mannie had left.

The Postal Service's claim that the affiants' statements regarding disparate treatment are contradicted by Mannie's deposition is similarly misplaced. In their affidavits, both Pettus and Graham claim that Mannie was always sent home "early" by her supervisors in the Nixie Unit. The Defendant responds that, because Mannie admitted in her deposition that she always worked the six hours per day required by the union agreement, the affidavits are contradictory and thus not admissible as evidence. (Def.'s Reply, at 7-8.) This debate over semantics does not dispute the assertion that Mannie was treated differently than other Postal Service employees. The use of the term "early" by the affiants can reasonably be interpreted as a statement that it was common for other light or limited duty employees of the Nixie Unit to work a full shift, while Mannie was not allowed to do so.

*Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989), cited by Defendant, is not to the contrary. Plaintiff in that case provided only his own affidavit and that of another disgruntled employee asserting that Sears had dismissed him because of his age. As Judge Posner wrote, "a party to a lawsuit cannot ward off summary judgment with an affidavit or deposition based on rumor or conjecture." *Id.* at 1572. Here, in contrast, Mannie does not rely only on her own affidavit, but provides evidence from two co-workers who witnessed what they felt was disparate treatment by her supervisors.

20

In addition to disputing the admissibility of the affidavits, the Postal Service further contends that Mannie submits no direct evidence that other workers in the Nixie Unit were similarly situated to her (*i.e.* also part-time regular employees). (Def.'s Reply, at 9.) The court notes that Mannie does not provide statements from any employees who actually received the alleged preferential treatment, nor does she submit any information regarding these individuals' employment status or records of the actual hours they worked. Further, Mannie bears the burden of persuasion to provide evidence showing a genuine issue of material fact as to these issues. The court is unwilling, however, to overlook the fact that Defendant, which has ready access to this information, has offered no evidence that the other Nixie Unit employees are not part-time regulars. If, at trial, Defendant presents evidence that the allegedly favored employees were in fact not similarly situated to Mannie, then a reasonable trier of fact would likely find Mannie unable to show a materially adverse employment action. The record now shows that the listed employees worked in the same unit as Mannie, worked the same shift, and also suffered from physical disabilities. Without evidence to the contrary there exists at least a genuine issue of material fact that the other individuals employed in the Nixie Unit were similarly situated to Mannie. Defendant's motion for summary judgment on this claim is denied.

**B.    Retaliation Claim**

Mannie's second claim is that the Postal Service treated her differently than other similarly situated employees in the Nixie Unit, not only to discriminate against her based on her mental disability, but also in retaliation for her earlier EEOC claims against the Postal Service, which were rooted in both her mental and physical disabilities. A plaintiff claiming retaliation can defeat summary judgment in one of two ways: (1) providing direct evidence of the employer's intent to retaliate, or (2) establishing a *prima facie* case of retaliation under the burden-shifting approach elucidated by the Supreme Court in *McDonnell Douglas Corporation v. Green*. *Stone v. City of*

*Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir.), *cert. denied*, ___ U.S. ___, 123 S.Ct. 79 (2002); *McDonnell Douglas*, 411 U.S. 792, 802-04 (1973). Mannie provides no direct evidence of the Postal Service's intent to retaliate against her, and the Postal Service adamantly denies all such claims. Thus, to prove retaliatory practices under the indirect *McDonnell Douglas* approach, Mannie must show that: (1) she engaged in a statutorily protected activity; (2) she met her employer's expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than any other similarly-situated employee who did not engage in such protected activity. *Stone*, 281 F.3d at 644.

The court notes that there is an alternate approach that the Seventh Circuit followed prior to *Stone*, and which it has followed at least twice since *Stone* was decided. *See Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1008 (7th Cir. 2002); *Frazoni v. Hartmarx Corp.*, 300 F.3d 767, 772-73 (7th Cir. 2002). Under this approach, plaintiff must show: "(1) that she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; (3) there is a causal link between the protected activity and the adverse action." *McKenzie v. Ill. Dept. of Trans.*, 92 F.3d 473, 483 (7th Cir. 1996). Mannie mentions neither *Stone* nor the more traditional analysis of retaliation claims in her briefs. Regardless of which test is applied, however, Mannie fails to meet the standard of evidence necessary to survive summary judgment.

The record shows that Mannie had brought at least two prior EEOC claims against the Postal Service: (1) in February 1994, claiming that the Postal Service had passed her over for employment based on her mental disability (she dropped this claim when she was hired), and (2) in September 1996, claiming she had been terminated due to her disability (she was reinstated, but the Postal Service was not found to have discriminated against her). In addition, she filed a workers' compensation claim with the U.S. Department of Labor in October 1996, claiming that her physical disability was caused by repetitive lifting of heavy mail on the job. This claim was initially denied, but Mannie won compensation on appeal in May 1997. Several individuals

mentioned by Mannie in this suit, including her direct supervisors, were named in at least one of her earlier actions.

Mannie clearly engaged in protected activity prior to her current claim, but she otherwise fails to establish the proof necessary under the *Stone* rubric because she has not identified similarly situated persons who: (1) did not file discrimination claims and (2) received more favorable treatment. Her claim fares no better under the more traditional analysis because she has shown no causal link between her EEO claims and the adverse employment action. The Seventh Circuit has held repeatedly that a mere temporal proximity between statutorily protected activity and adverse action is not enough to show a causal connection. *See Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 532 (7th Cir. 2003). Here, Mannie has not shown even the slightest link between her earlier EEO complaints and the adverse action of her supervisors. The complaints regarding her mental and physical disability and the adverse action of limiting her work hours and overtime were separated by months, and in some cases even years. While some of the individuals responsible for the alleged adverse actions were named in the earlier complaints, this alone is not enough to prove that Mannie's complaints were the cause of their behavior. As Mannie fails to establish a *prima facie* case of retaliation under either the *Stone/McDonnell Douglas* construction or the more traditional analysis, summary judgment on her retaliation claim is appropriate.

## C. Hostile Work Environment Claim

Mannie's final claim is that her supervisors and co-workers harassed her and created a hostile work environment. As evidence of this, she provides her affidavit and the affidavits of two co-workers who claimed to have seen and heard Mannie's supervisors reveal information about Mannie's mental impairment to her co-workers, call Mannie "crazy" on many occasions, and announce that Mannie was unable to do particular tasks at the Postal Service. Mannie also alleges a series of activities by her co-workers created stress and humiliation for her.

Hostile work environment claims have most often accompanied sexual or racial harassment claims, rather than disability claims. *Silk*, 194 F.3d at 803. The Seventh Circuit has never explicitly recognized a hostile work environment claim based on the ADA, although at least two other circuits have done so. *Id.; see also Miranda v. Wisconsin Power & Light Co.*, 91 F.3d 1011, 1017 (7th Cir. 1996). Assuming such a cause of action does exist, Plaintiff would need to meet the test established in Title VII cases by the Supreme Court. *Silk*, 194 F.3d at 804; *Davis-Durnil v. Village of Carpentersville*, 128 F. Supp. 2d 575, 583-84 (N.D. Ill. 2001). For a work environment to be considered "hostile," it must be severe enough to have altered the conditions of the victim's employment. Whether an environment is "hostile" can only be determined by taking into account all of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). In order for a hostile work environment claim to succeed, a plaintiff must show not only that she personally found the environment hostile, but also that a reasonable person would find it so—that is, the work environment must be both subjectively and objectively hostile. *Harris*, 510 U.S. at 21-22; *Silk*, 194 F.3d at 804. In addition, in this Circuit, a plaintiff must demonstrate that "his workplace is permeated with discriminatory conduct—intimidation, ridicule, insult—that is sufficiently severe or pervasive to alter the conditions of his employment." *Id.* at 804.

In *Silk*, the plaintiff, a sergeant in the Chicago Police Department, suffered from severe sleep apnea and, as a result, was limited to working only "second watch" (*i.e.,* day shift). *Id.* at 795. Silk claimed that, as a result of resentment and jealousy among fellow officers that he only worked the day shift, he was subjected to a pattern of harassment that included: (1) verbal abuse (Silk was referred to by supervisors as a "useless piece of [vulgarity]," a "medical abuser," and a "limited duty phony," and his condition was referred to in roll call as his "[vulgarity] medical problem"); (2) threats of physical violence (his co-worker told him "it won't take much to have me

knock you on your [vulgarity] right now," and his supervisor warned him there might be a bomb

under his car); (3) lowered performance ratings; (4) compelled loss of his night job teaching classes

at Chicago State University, and (5) administrative harassment (loss of days of leave, not being

given supervisory duties, and being ridiculed). *Id.* at 796-97. Taking the cumulative effect of all

of Silk's claims into account, the Seventh Circuit held that he did not meet the burden necessary

to avoid summary judgment on his hostile work environment claim because the alleged actions did

not alter the conditions of his employment.

Mannie cites a litany of examples to support her claim that her supervisors and co-workers

at the Postal Service created a hostile work environment, but in this court's view, none of her claims

meet the standard established in *Silk*. For Mannie's supervisors to spread information about her

mental disability, refer to her among her co-workers as "crazy," and claim that she could not be

trusted to operate a certain piece of machinery because she was not a "live body" was

inappropriate and insensitive. Even if the remarks were made repeatedly and over a period of time,

however, there is no evidence that they altered the conditions of her employment.

Plaintiff in *Silk* was the object of harassment, derision, and even threats of violence from

both supervisors and co-workers. Mannie, conversely, provides no evidence that any harassing

remarks were made to her directly, but only that she heard second-hand from co-workers that her

supervisors had made them. More importantly, Mannie presents no direct evidence that the

remarks affected her job performance or altered the conditions of her employment at all. As for

Mannie's more extenuated claims (the "tight fitting" apparel and "strutting" of her female colleagues,

being hugged merely to ascertain her "body odor," the letters placed in her locker, and being

"followed" by a male colleague), they are completely unsubstantiated by any other source. Even

in the unlikely event these allegations do represent some type of harassment, the events would not

rise to the level of an objectively hostile work environment under the standards set forth in *Silk*.

The court sympathizes with Mannie, as the alleged treatment she received from her

25

supervisors, if true, was unfortunate and unbecoming of individuals who work in public service. The evidence she has presented does not, however, meet the standard in this Circuit for proof of hostile work environment claims. Defendant's motion on the hostile work environment claim is granted.

## CONCLUSION

Mannie has presented evidence which could support a finding of disparate treatment based on her psychological disorder. The evidence does not establish a genuine issue of material fact with regard to her claim of retaliation or claim of a hostile work environment, however. Defendant's motion for summary (Doc. No. 15-1) is denied as to the claim of discrimination based on disparate treatment, and granted as to the claims of retaliation and creation of a hostile work environment.

ENTER:

Dated: August 4, 2003

REBECCA R. PALLMEYER
United States District Judge

26